AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

**FILED**

DEC – 5 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| United States of America | ) | |
| v. | ) | Case No. |
| BRANDON FRERE | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

3   18   71724

SK

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____April 30, 2018_____ in the county of _____Sonoma_____ in the
_____Northern_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 1343 | Wire Fraud |

Maximum Penalties:
Maximum Prison Term of 20 Years;
Maximum Fine of $250,000, or not more than the greater of twice the gross gain or twice the gross loss (18 U.S.C. § 3571);
Maximum Term of Supervised Release of Three Years;
Mandatory Special Assessment of $100.

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

Approved as to form _____
AUSA  Scott D. Joiner

_____
*Complainant's signature*

Christopher J. Bognanno, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  12-5-18

_____
*Judge's signature*

City and state:  _____San Francisco, CA_____

Hon. Sallie Kim, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF CHRISTOPHER J. BOGNANNO
IN SUPPORT OF CRIMINAL COMPLAINT**

I, Christopher J. Bognanno, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, being duly sworn, declare and state:

## I.      INTRODUCTION

1.      I make this affidavit in support of an application for a criminal complaint against BRANDON DEMOND FRERE ("FRERE"), who resides in Northern California. As set for the below, there is probable cause to believe FRERE committed wire fraud in violation of Title 18, United States Code, Section 1343.

2.      I am a Special Agent with the FBI and have been so employed since 2015. Since September 2015, I have been assigned to the San Francisco Division of the FBI. As part of my assigned duties, I investigate possible violations of federal criminal law. Specifically, I am responsible for investigating complex financial crimes. I successfully completed New Agent Training at the FBI Academy in Quantico, Virginia in August 2015. I have participated in the execution of search warrants and criminal arrests; and have received training in, among other things, criminal procedure, search and seizure, financial investigations, money laundering techniques, investigative procedures, asset identification, forfeiture, confidential source management, and electronic surveillance techniques, including Title III monitoring. During my career with the FBI, I have also received specialized training in the investigation of various types of fraud and the use of sophisticated investigative techniques. In addition, I have participated in numerous criminal investigations involving various types of fraud and money laundering. I have submitted probable cause statements in the form of sworn affidavits to federal magistrate judges in the Northern District of California.

3.      The facts stated in this affidavit are based on my personal knowledge, on my review of reports prepared by other law enforcement officers, documents and records prepared by others, public court filings, and on conversations I have had with other law enforcement officers and witnesses involved in this investigation.  Because this affidavit is submitted for the

limited purpose of establishing probable cause in support of a Complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the Complaint sought herein. Unless otherwise indicated, where actions, conversations, and statements of others are related herein, they are related in substance and in part.

4.      As described in more detail below, the investigation to date indicates that FRERE used various companies that he controlled to operate a fraudulent student loan debt relief scheme to unjustly enrich himself and his family members from in or about at least 2014 to November 2018.[1] FRERE targeted recipients of federal student loans who were often struggling to make payments and devised a scheme to steal millions of dollars from them for the benefit of himself and his family members. As set forth below, there is probable cause to believe that there were interstate and foreign wire communications in furtherance of and incident to an essential part of the scheme.

## II.      RELEVANT LAW

5.      Title 18, United States Code, Section 1343, prohibits wire fraud. The elements of the offense are as follows:

    a.  First, the defendant knowingly participated in, or devised, a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts;

    b.  Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

    c.  Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

---

[1]      Because FRERE utilized various companies and employees that he controlled as part of his scheme, I refer to "FRERE" in this affidavit to identify actions that (i) he personally undertook or (ii) actions that he caused various entities and employees working for him to undertake as part of his wire fraud scheme. For the same reasons, I also refer to FRERE's "representatives" and/or "agents" to describe individuals who interacted with victims and potential victims on behalf of the Companies (defined below) pursuant to the scheme devised by FRERE.

      d.   Fourth, the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

## III.    FACTS ESTABLISHING PROBABLE CAUSE

### A.    The Debt Relief Scheme

6.    Judge Saundra Brown Armstrong recently laid out many of the facts establishing probable cause in her November 29, 2018 Order Granting Motion for Preliminary Injunction in *Federal Trade Commission v. American Financial Benefits, et al.*, Case No. CV 18-00806-SBA. *See* ECF Nos. 186 (Nov. 29, 2018 Order) and 187 (Preliminary Injunction).  The Court's Order is attached here and incorporated by reference as **Exhibit A** in support of the requested Complaint.

7.    In issuing the preliminary injunction, the Court found that the Federal Trade Commission (FTC) "is likely to prevail" on its consumer fraud action against FRERE and his companies.  ECF No. 186 at 19.  In reaching its holding, the Court recognized that "the FTC has put forth a robust record that includes thousands of pages of consumer complaints, consumer declarations, former employee declarations, consumer call recordings, undercover call recordings, and more.  That evidence tells a consistent story – one in which deceptive and abusive practices pervade."  ECF No. 186 at 23.  I have reviewed many of these same materials as part of the criminal investigation.

8.    The FTC filed its civil complaint against FRERE and his student loan debt relief enterprise on February 7, 2018. FRERE's student loan debt relief scheme is made up of the following entities: AMERICAN FINANCIAL BENEFITS CENTER ("AFBC"), AMERITECH FINANCIAL ("AMERITECH"), and FINANCIAL EDUCATION BENEFITS CENTER ("FEBC") (collectively "the Companies").

9.    The following description of fraudulent conduct (in the lettered subparagraphs) is

taken largely from the Court's Order granting the Preliminary Injunction (Exhibit A).[2]   In addition to publicly available court records concerning the FTC action and other information noted above, I have also reviewed bank account statements, witness and victim declarations, marketing and sales material, and other records obtained during the investigation that corroborate the Court's findings and support the requested Complaint.  Based on this review I have learned the following:

The Companies

a.   AFBC was incorporated in California in February 2011. AFBC is located at 311 Professional Center Drive, Suite 200, Rohnert Park, CA 94928 and 1900 Powell Street, Suite 600, Emeryville, CA 94608.  Both locations are within the Northern District of California.

b.   AMERITECH was incorporated in California in October 2015. AMERITECH is located at 1101 Investment Boulevard, Suite 290, El Dorado Hills, CA 95762 and 5789 State Farm Drive, Suite 265, Rohnert Park, CA 94928. The Rohnert Park location is within the Northern District of California.

c.   FEBC was incorporated in California in October 2015. FEBC is located at 2010 Crow Canyon Place, Suite 100, San Ramon, CA 95483, which is in the Northern District of California.

d.   FRERE is the founder, majority owner and Chief Executive Officer of the Companies. FRERE formulated, directed, controlled, or participated in the operations connected to the Companies.

Department of Education Student Loan Forgiveness and Repayment Programs

e.   The Department of Education ("ED") offers a limited number of student loan forgiveness programs. Compl. (ECF No. 1) ¶ 15. One such program is Public Service Loan Forgiveness ("PSLF"), which allows borrowers employed in the public sector to have a portion of their loans forgiven after making timely payments for a period of ten years. *Id.* ¶ 16. Another such program is income-

---

[2]      I have included much of the Court's language verbatim.  All docket (ECF) citations were included in the Court's Order and refer to *Federal Trade Commission v. American Financial Benefits, et al.*, Case No. CV 18-00806-SBA.  Because the filings are voluminous, I have not included all declarations and attachments that the Court relied upon in granting the preliminary injunction.  However, I have quoted extensively from the Order – including its citations to various declarations and attachments – to underscore the fact that Judge Armstrong relied on a substantial factual record when issuing her order and determining that the FTC was likely to prevail on its claims of consumer fraud and abuse.

driven repayment ("IDR"), which enables borrowers to reduce their loan payments based on a percentage of their discretionary monthly income. *Id.* ¶ 17. After making timely payments for a period of 20 or 25 years under an IDR program, borrowers may have a portion of their loans forgiven. *Id.* Before this time has elapsed, and because payment amounts may vary over the life of the loan, it is impossible to promise a borrower loan forgiveness in any specific amount.

    f.    Borrowers can apply for PSLF, IDR, and other such programs through the ED or their student loan servicers at no cost; the programs do not require the assistance of a third party or the payment of application fees. *Id.* ¶ 19. While an application for an alternative repayment plan is pending, borrowers can request a forbearance, which allows them to stop making student loan payments. *Id.* ¶ 20. During a forbearance, interest continues to accrue and be capitalized. *Id.*

The Debt Relief Enterprise

    g.    From at least 2014 through November 2018, FRERE used the Companies to operate a debt relief enterprise.   FRERE advertised, through print mail and online social media platforms, student loan payment reduction and forgiveness, and offered a document preparation service and a purported financial education membership program.

    h.    FRERE and the Companies collected advance fees of $600 to $800 per victim[3], purportedly to prepare and submit documents to enroll consumers in PSLF, IDR, and other alternative repayment plans.  FRERE and the companies also collected enrollment fees ranging from $100 to $1,200, as well as monthly fees ranging from $49 to $99 for the financial education membership program. Conservatively, FRERE and the Companies collected over $28 million from 2014 to March 2018.  Exhibit A at 3; *see also* Ex. B (George Decl.) ¶ 8.  As described in more detail below, they did so by using fraudulent misrepresentations and omissions.

Misrepresentations Concerning Fixed Payments and Loan Forgiveness

    i.    As previously noted, the ED offers IDR plans that allow eligible borrowers to limit their monthly loan payments to a percentage of their discretionary monthly income. IDR and PSLF plans may also enable borrowers to have portions of their loans forgiven. Only the ED can determine a borrowers' eligibility for these plans. Income and family size determine both borrowers' eligibility and the amount of their monthly payments, and these variables must be recertified annually. Because income and family size likely fluctuate over

---

[3]    The Court in its Order often used the term "consumer" to refer to victims of the scheme. I have attempted to use the term "victim" in this affidavit, but I also use the terms "consumer" and "victim" interchangeably to refer to individuals who were targeted and/or harmed by the scheme, depending on the context.

the life of the loan, monthly payment amounts can vary considerably from year to year. It is therefore not possible to promise fixed monthly payments for the life of the loan.

j.   Additionally, obtaining loan forgiveness requires a minimum of 10, 20, or 25 years of qualifying payments, depending on the plan in which a borrower is enrolled. Because payment amounts may increase over time, the loan may be paid off before any amount can be forgiven. It is therefore not possible to promise loan forgiveness in any amount, let alone a specific amount. Despite the foregoing, FRERE and his companies promised consumers fixed monthly payments and loan forgiveness under their program

k.   FRERE's Companies disseminated direct mail solicitations advertising "student loan payment reduction and forgiveness." Ortiz Decl. (ECF No. 66), Att. S; Rhode Decl. (ECF No. 67), Att. D.[4] The mailers represent that the addressee is "eligible" or "pre-qualified" for the programs. *Id.* In some instances, the mailers advertise payments and savings in specific dollar amounts. *Id.* The mailers create a sense of urgency by stating that the offers are available only for a limited time. Stiner Decl. (ECF No. 70), Ex. QQ.[5] The mailers do not identify FRERE or the Companies by name; rather, they purport to be from the "Student Loan Department." *Id.* Notably, the mailers do not advertise any financial education membership program. *Id.* Finally, the mailers include a toll-free number for consumers to call for more information.

l.   During the subsequent sales calls, company representatives continue to misrepresent the costs and features of the federal repayment plans. Sales agents represent that callers have been qualified for the promised repayment plan. Stahl Decl. (ECF No. 69), Att. G at 9:2-6;[6] Stiner Decl., Att. BB at 47:11-13. Agents further represent that, under "the program," consumers will make lower monthly payments for a fixed period, after which the remaining balance of their loans will be forgiven. Stiner Decl., Att. BB at 22:2-24:13.

---

[4]   Kelly Ortiz is an investigator for the FTC who filed a declaration attaching supporting documents in connection with the FTC's motion for a preliminary injunction. Steve Rhode is an investigative reporter who also filed a declaration attaching various documents that he had received from victimized consumers.

[5]   Daniel Stiner is the Director of Trade Practices for the Better Business Bureau serving Northeast California ("Sacramento BBB"). He submitted a declaration in support of the FTC's motion for a preliminary injunction to which he attached consumer complaints and communications concerning the Companies that had been received by the Sacramento BBB. He also attached communications between FRERE and others with the Sacramento BBB, as well as recorded consumer calls with AMERITECH and transcripts of the same.

[6]   Ann Stahl is an investigator for the FTC who placed undercover calls to AFBC and AMERITECH. She submitted declarations in support of the FTC's motion for a preliminary injunction to which she attached recordings and transcripts of the calls.

m. Agents also represent that consumers will save a specific amount of money. *Id.* For example, agents instruct callers to make a chart, on which they are told to record various sums. Stiner Decl., Att. BB at 22:2-24:13. Callers are instructed to write "current" on one side of the chart and "program" on the other. Id. at 22:13-16. Under "current," the callers are told to record the payment amount of their current repayment plan and the purported total cost over the life of the loan. *Id.* at 22:18-23:1. Under "program," callers are told to record their new payment amount under "the program" and—assuming that sum will remain fixed for the entire repayment period—the total cost of "the program." *Id.* at 23:3-24:4.4. Agents advise that, after callers make a set number of payments, the remaining balance of their loans will "be forgiven." *Id.* at 24:6-8. Agents instruct callers to record a final sum, representing the "total saved." *Id.* at 24:6-10. Agents advise that "the goal is not to pay off your federal student loan," but rather, to pay as little as possible to obtain the maximum discharge. Gonzalez Decl. (ECF No. 59), Att. B at 56:11-14.[7]

n. During sales calls, FRERE's representatives also obfuscate the Companies' fee structure, conflating their fees and borrowers' loan payments by referring to these amounts collectively as the consumers' payments under "the program." Ortiz Decl., Att. ZZ at 10:25-11:19; *see also id.* at 12:4-9 ("These are all federal programs, and payments need to be made on time."). The quoted monthly, yearly, and total costs of "the program" include not only the borrowers' loan payments, but also fees paid to FRERE's Companies.

o. These representations regarding the cost of "the program" are misleading in several respects. First, payments under "the program" are juxtaposed with consumers' "current" payments, which include only their student loan payments. Thus, agents are not comparing "apples with apples" (i.e., payments under the current repayment plan and payments under the alternative repayment plan).

p. Second, payments under "the program" include a monthly fee for the "financial education" membership, a service that is unrelated and in no way a prerequisite to a borrower's participation in an alternative repayment plan. Judge Armstrong noted that "it is telling that Defendants never present consumers with the (presumably much greater) savings that could be achieved under an alternative repayment plan alone, without the membership program." Ex. A at 5.

/ /

---

[7] David Gonzalez is an investigator for the FTC who placed undercover calls to AFBC and AMERITECH. He submitted declarations in support of the FTC's motion for a preliminary injunction to which he attached recordings and transcripts of the calls, as well as email communications he received from AMERITECH.

Misrepresentations Concerning Program Eligibility and Family Size

q.  FRERE's representatives also misrepresented consumers' eligibility for an alternative repayment plan and the reduced monthly payment. As stated above, factors such as income and family size determine whether a borrower qualifies for a repayment plan and the monthly loan payment amount. Regulations limit those included in "family size" to the borrower, the borrower's spouse, children who receive more than half their support from the borrower, and other persons who both live with and receive more than half their support from the borrower. 34 C.F.R. § 682.215(a)(3).

r.  FRERE's agents enrolled the maximum number of consumers by "aggressively inflating family size figures." Hamilton Decl. (ECF No. 60) ¶ 10; see also Martinez Decl. (ECF 64) ¶ 8, ("It was common practice to exaggerate family size figures in order to get people to qualify.").[8] During sales calls, agents counsel consumers to report higher family sizes by misrepresenting the level of support required to include someone as a family member.

s.  For example, one sales representative told a caller:

> Now, support includes any kind of money, gifts, loans, housing, food, clothing, car, medical or dental, payment of college costs. Do you help anybody – if you have somebody on your cell phone plan; if you have somebody on your gym membership, they're considered part of your family. And we just had Christmas. You know, if you bought presents, clothes, watch, earrings, toilet paper, they're a part of your family. Okay?

Stiner Decl., Att. DD at 20:6-14. The caller reported that he was "still at home" and asked whether his "mom, dad, and . . . brother" should be included in his family size. *Id.* at 20:19-21. The agent responded, "Absolutely." *Id.* at 20:22. After adding the borrower and his fiancée—to achieve an already inflated family size of five—the agent further inquired:

> [I]s there any other maybe friends that come . . . stay with you that you . . . feed them, you clothe them . . . go hang out . . . go to see a movie, you pay for them . . . you drive them around, gas, you know, take them to work? Is there . . . anybody that you bought Christmas presents for, maybe a niece, nephew, somebody that you would be able to add in, somebody in your family?

*Id.* at 21:4-13.

t.  When prospective customers express skepticism, FRERE's representatives

---

[8] Jacob Martinez and Daniel Hamilton are former employees of AMERITECH who submitted declarations in support of the FTC's motion for a preliminary injunction.

made additional false or unsubstantiated representations to reassure them. Agents emphasized that family size is quite broad and more inclusive than "dependents." *Id.* at 18:7-14; Ortiz Decl., Att. LL at10:13-18 (stating that the definition of family size is "rather broad" and explaining that, even though the agent is "a dad with a daughter," when he includes all the people he supports "under this definition," his family size is "probably . . . closer to eight"). Agents advised that family size is "pretty much just an arbitrary number that you as a client determine and provide me." Stiner Decl., Att. DD at 18:17-18; *see also id.* at 19:6-8 ("So, pretty much, it's just a number that's determined by you, just something that I got to put to keep the process moving."). Agents further advised that consumers will not be asked to verify or prove a family size of less than ten. Ortiz Decl., Att. LL at 13:12-20.

u.  Victims trusted the agents' purported expertise in determining family size. Vildasol Decl. (ECF No. 71) ¶ 5 ("[The agent" informed me that this was a new program and that he was an expert. I trusted him.").[9] Consumers may enroll in FRERE's program only to later learn that they do not qualify for an alternative repayment plan or the quoted monthly payments. *Id.* ¶ 10 (consumer was enrolled in program from June 2014 to September 2015 before his lender advised that he did not qualify for PSLF and claimed that he had unlawfully inflated his family size to qualify for a forbearance). In other cases, consumers may continue to be enrolled in a repayment plan for which they do not actually qualify. This can significantly set back consumers' repayment of their student loans and potentially expose them to additional liability. *Id.* ¶¶ 2, 14 (consumer paid Defendants $2,491 in fees while his student loans were kept in forbearance for 15 months; his loan balance increased from approximately $70,000 to $75,000 due to accrued interest).

Misrepresentations Concerning Fees

v.  As previously noted, FRERE's Companies collected various fees from victims. Victims were charged between $600 to $800 for document preparation services and anywhere from $100 to $1,200 to enroll in the financial education membership program. Archibald Decl. (ECF No. 50),[10] Att. B, Vildasol Decl., Att. A. FRERE's companies also charged a continuing monthly fee, usually between $49 and $99, for the financial education membership program. *Id.*

---

[9] Manuel Vildasol is a victim of the scheme who is a retired Marine living in New Mexico. He submitted a declaration in support of the FTC's motion for preliminary injunction describing his interactions with AFBC.

[10] Andre Archibald is a victim of the scheme living in Texas who submitted a declaration in support of the FTC's motion for preliminary injunction describing his interactions with AMERITECH.

w.  The Telemarketing Sales Rule (TSR) promulgated by the FTC generally prohibits sellers and telemarketers of any debt relief service from charging advance fees. 16 C.F.R. § 310.4(a)(5). A debt relief service provider cannot collect fees before it has successfully reduced or otherwise altered the terms of the consumer's debt and the consumer has made at least one payment on the reduced or altered debt. *Id.* If various safeguards are employed, a debt relief service provider may hold advance fees in an escrow account. *Id.* The use and terms of the escrow account must be disclosed to consumers in a clear and conspicuous manner. *Id.* § 310.3(a)(1)(vii)(D).

x.  FRERE and the Companies collected payment information from consumers during the initial sales calls. Stiner Decl., Att. CC at 17:17-18:12. Consumers pay all or a portion of the document preparation fee and financial education membership program enrollment fee almost immediately, and often long before they are enrolled in a new loan repayment plan. Archibald Decl. ¶¶ 7, 9-11, 13 (consumer enrolled 1/8/16; first payment deducted 2/5/16; forbearance notice received 6/9/17; IDR adjustment received 7/4/17); Vildasol Decl. ¶¶ 4, 8, 10 (consumer enrolled 4/3/14; first payment deducted 5/30/14; consumer learned his loan was in forbearance and he did not qualify for PSLF in September 2015).[11]

y.  More importantly, FRERE's scheme charged a monthly fee for the "financial education" membership program. This fee was encompassed within the program costs quoted to consumers. FRERE's agents represented that the fee was tied to consumers' enrollment in an alternative repayment plan and that some or all of the monthly payments under "the program" were applied to consumers' outstanding loan balance. Archibald Decl. ¶¶ 4, 13, 15; Vildasol Decl. ¶¶ 7, 11; Stiner Decl., Att. BB at 22:2-24:10 (describing costs under "the program"). For example, when a consumer asked, "On top of my other loans, I have to pay now you guys," the sales agent responded: "So it's a . . . part of the program. It's a part of . . . that monthly amount that I had . . . told you. So with the program, part of it is being paid toward . . . the enrollment fee, and then once it drops, it goes straight to your loan servicer, and it

---

[11]     Prior to 2015, AFBC collected advance fees directly from consumers. In late 2015, AMERITECH and FEBC were formed and partitioned the document preparation and financial education membership services. Ortiz Decl., Att. EEE at 3. Since that time, Ameritech has held advance fees for its services in escrow accounts. In the civil litigation, FRERE and the Companies claimed not to deduct funds from the escrow accounts until fees have been "earned" under the TSR. *Id.*, Att. DDD at 8, 11. The Court does not appear to have credited this claim, however, noting that "Defendants provide conflicting statements as to when exactly that occurs and acknowledge that fees may be deducted before consumers are enrolled in an alternative repayment program and/or before they make their first payment thereunder... Defendants have also failed to clearly and conspicuously disclose the use and terms of the escrow accounts." Ex. A at 8-9.

partners with that." Ortiz Decl., Att. BBB at 51:4-13. As Judge Armstrong found, "This is false." Ex. A at 9.

z. When pressed, FRERE's agents admitted that the monthly fee pays for a financial education membership program; however, they generally obscure this fact. The Companies do not advertise the financial education membership program on their mailers and infrequently mention it during sales calls. When the membership is mentioned on sales calls, agents describe it as a complimentary service. Stiner Decl., Att. CC at 36:12-37:17 (describing the membership as "a free account").

aa. Monthly payments for the financial education membership program also continue for the term of consumers' student loans, falsely making it appear that the fees are related to their continued enrollment in an alternative repayment plan. Stiner Decl., Att. BB at 22:2-24:10. In furtherance of this misperception, FRERE's agents represented that canceling enrollment in "the program" would also terminate a borrower's enrollment in an alternative repayment plan and return him/her to a standard repayment plan. *Id.*, Att. CC at 26:7-12; Ortiz Decl., Att. BBB at 53:16-21. Finally, if consumers miss a payment for the financial education membership program, the Companies send correspondence suggesting that the consumer is at risk of falling behind on his/her student loan payments. Sills Decl. (ECF No. 68), Att. D (including "RE: Student Loan Payment" and urging swift action to "get your file back on track").

bb. Judge Armstrong also found that approximately ninety percent of consumers who enroll with Ameritech also enroll in FEBC's "financial education" membership program. Ortiz Decl., Att. GGG at 2. Former customers aver that they would not have knowingly enrolled in or paid for such a program, however. Archibald Decl. ¶¶ 14-16; Sills Decl. ¶ 8. As the Court noted, "[t]his is unsurprising, given that consumers contact Defendants for the express purpose of reducing monthly expenses." Ex. A at 10.

<u>Other Deceptive Practices Employed to Facilitate the Wire Fraud Scheme</u>

cc. FRERE and the Companies also employed other practices that facilitated the scheme. First, as Judge Armstrong noted, after convincing a victim to enroll in "the program," sales agents emailed lengthy and confusing contracts that the victim is required to sign electronically during the sales call. Archibald Decl. ¶ 5; Vildasol Decl. ¶ 6. Sales agents reassure victims by stating that the contracts merely reiterate information that has been provided throughout the call. Stiner Decl., Att. BB at 53:17-60:8. After the victim has signed the contracts, he/she is transferred to the "Verification Department." Ortiz Decl., Att. DDD at 7. Another representative then quickly reads through a script providing important legal qualifications and clarifications that often conflict

with sales agents' earlier representations. Stiner Decl., Att. BB at 63:22-83:18; id., Att. CC at 43:8-70:78.

dd. FRERE and the Companies also interfered with communications between borrowers and their loan servicers, making it more difficult for consumers to discover the scheme's deceptive practices. The Companies required victims to provide highly sensitive information, including Social Security numbers and Federal Student Aid ("FSA") login IDs, passwords, and security questions. Archibald Decl. ¶¶ 8, 12. In some cases, FRERE's representatives changed borrowers' FSA passwords and contact email addresses, causing loan-related correspondence to be sent directly to the Companies and locking victims out of their own student loan accounts. Lee Decl. (ECF No. 62) ¶ 13, (AFBC.Confirmation@afcenter.com input as contact email address for 199 borrowers with one loan servicer).[12] Additionally, FRERE's representatives also routinely placed borrowers' loans in forbearance, sometimes for lengthy periods, during which time borrowers are not required to make loan payments and loan servicers are prohibited from contacting borrowers. Id. ¶ 11. Thus, consumers may be unaware that their loans are in forbearance, continuing in the belief that their monthly payments to the Companies are being applied to their student loans. Archibald Decl. ¶ 13; Vildasol Decl. ¶¶ 10, 14.

**B.    Declarations From Victims Regarding the Scheme to Defraud**

10.    The public record is filled with declarations, signed under penalty of perjury, that describe victim interactions with the Companies.  Four such declarations are summarized below. These are summaries only and not intended to capture every statement in the declarations.

11.    Beverly Sills resides in Memphis, Tennessee and works at a Veteran's Affairs Hospital.  Her declaration was filed on March 5, 2018 (ECF No. 68).

a. Around February 2015, she received an email stating that she qualified for lower interest payments on a student loan. She called the phone number provided in the email and spoke with a representative named Michael. Michael told her he worked for AmeriTech Financial ("AMERITECH") and that AMERITECH would take over her loan from FedLoans, a loan servicer for the federal government. Michael sent a lot paperwork relating to her student loans. He told her that her new monthly student loan payment would

---

[12] Benjamin Lee is a Senior Policy Analyst at Great Lakes Higher Education Corporation (Great Lakes), a private company that services loans for the Department of Education. He has held that position since 10/6/2014. One of the first projects he was assigned was to track and understand the behavior of third party debt relief companies and how their behavior affected Great Lakes and its borrowers.  Mr. Lee submitted a declaration in support of the FTC's motion regarding his analysis concerning AFBC and other related topics, including incidents where a Great Lakes' borrower had their email contact information changed to an AFBC email address.

be $207 for several months, then $99 for one year, and then revert back to $207 for at least 10 years. He also said she had to make an up-front payment of $250 to AMERITECH and $50 to another entity. The payment structure was confusing, but she trusted AMERITECH. She completed the paperwork and began making monthly payments to AMERITECH. In 2016, she received a letter stating that her student loan was in forbearance.

b. In February 2016, she received a letter from Global Client Solutions stating that it was her "account provider." An information sheet attached to the letter stated, "Global is the account provider for your dedicated Account. Our duties include the drafting of funds from your primary bank account into your Account as provided for in your Application as well as executing disbursement instructions in a commercially reasonable manner as soon as practical after receipt of such instructions." In January 2017, she received a letter from AMERITECH stating, "Account Management Plus will collect all payments moving forward." The letter was confusing, but said, "Nothing about your payments or payment plan will change." In summer 2017, it dawned on her that something was not right so she called FedLoans to inquire about the status of her student loan. FedLoans told her that it had not received any loan payment from her since December 2015. FedLoans explained that she had been scammed.

c. She paid AMERITECH over $3,000 that she believed was going towards her student loan. She is a single person who works in the health care profession and could not afford to lose this money. When AMERITECH contacted her, the loan balance was approximately $23,000. It then ballooned to $30,000 due to unpaid monthly payments and interest. She stopped paying AMERITECH when she discovered that none of her money was going towards her student loan.

12.    Craig Davis lives in Erie, Pennsylvania and works for LORD Manufacturing Company. His declaration was filed on March 5, 2018 (ECF No. 55).

a. Mr. Davis worked for Hammermill Paper Company for over 20 years and earned around $40,000 per year.

b. When the plant closed, he went to a trade school (Universal Technical Institute) and acquired around $50,000 in student debt. He was the oldest student at the school and graduated at the top of his class with a 3.97 GPA. Around summer 2016, he received a mailer stating that he qualified for a reduced student loan payment. He called the number listed on the mailer and spoke with someone who said he could help reduce his loan payment. The number he called was for AmeriTech Financial ("AMERITECH"). The AMERITECH agent gave him a lot of information very quickly. Based on the agent's statements, he believed his student loan payment would be reduced to $0 or $20,000. The agent also promised a 100% client satisfaction. While he

13

was on the phone with the AMERITECH agent, he emailed him many documents. Some documents appeared to be contracts and forms. All the fields on the forms were blank. The AMERITECH agent quickly discussed the documents with him and told him where to sign electronically. The agent said he would fill in the information on the forms later. Davis did not understand the electronic signature, but trusted the AMERITECH agent and followed his instructions. Everything was going so fast and he did not have time to read every document. A few weeks after his call with the AMERITECH agent, his bank called him to report a bounced transaction. He was surprised to learn that AMERITECH had withdrawn $207 from his checking account. He was not aware that AMERITECH was going to automatically withdrawn funds from his bank account and was not prepared for the payment.

13.     Scott Belnap resides in Riverton, Utah. His declaration was filed on April 19, 2018 (ECF No. 104).

    a.   In December of 2017, Belnap graduated from Boise State University and had a significant amount of student loan debt. As a professor at Salt Lake Community College, he knew that there were certain debt relief programs available to public servants, but he was not familiar with them and did not know how to apply. He and his wife began researching how to get assistance with this process and stumbled on a website called thecollegeinvestor.com. It was through a link on this site that led Belnap to AmeriTech Financial ("AMERITECH "), a company he thought could help me with his student loan debt.

    b.   At first, his wife spoke to them on the phone but since she was still in college, she decided not to enroll. She did however tell the representative of AMERITECH that Belnap had just graduated and could use some help. On April 2, 2018, Belnap spoke to an AMERITECH representative on the phone. He recalled the conversation being very fast and scripted. They told him they were a document preparation company that would prepare and submit the proper paperwork to get me into the public service loan forgiveness program. They stated that they would charge his yearly fee that would be paid over a series of months. He was told that under this program, if he consistently made a series of qualified payments for 10 years, his remaining student loan balance would be forgiven as long as he stayed employed in public service and worked at least 30 hours a week. One of the questions they asked him about was his family size. He remembers the conversation being very weird and the definition of family size was vague. He told them that he had two brothers in Salt Lake City that he occasionally helped out, one of which he recently bought a car transmission for. They told him that if he helped them financially, he should include them in his family. Based on this information, he claimed a family size of six. Based on his current student loan balance of approximately $136,000.00, he was told that currently, his approximate

monthly payments were going to be $1,400.00. He was then told that under the program, his monthly payments would be reduced to approximately $175.56.

c.  He was under the impression that AMERITECH was responsible for collecting the approximate monthly payment and would disburse $175.65 to his loan servicer while keeping approximately $80.00 for their fees. Based on this information, he was not planning on making any payments to his loan servicer since he was led to believe that was what he was paying AMERITECH for.

d.  On April 3, 2018, he received an email from Reliant Account Management informing him that they were an independent third party that would be processing his program payments. He did not know if they were affiliated with AMERITECH but assumed they were. He later realized that his contract included some paperwork about the Financial Education Benefits Center and that he had apparently agreed to pay $99.00 a month for benefits such as LifeLock, retirement services, etc. He was under the impression that these services were included as a bonus and were part of the program. He did not remember being told that he would be paying $99.00 for such services.

14.     Milton Marshal is an honorably discharged, disabled U.S. Navy veteran who resides in Las Vegas, Nevada.  His declaration was filed on March 5, 2018 (ECF No. 63).

a.  Mr. Marshal graduated from California State University – Los Angeles with a Bachelor of Arts in Child Development. In 2010, he earned a Master's degree in Education from Loyola Marymount University. He owes around $92,000 in student loans, mostly related to expenses from my Master's degree. He currently work for Veterans Affairs.

b.  On or around March 10, 2015, he became concerned that he would be unable to make his student loan payments, which were approximately $960 per month. Around this time, he believes he received a solicitation from a company called American Financial Benefits Center ("AFBC"), but does not recall the details. He remembers visiting AFBC's website in spring 2015.

c.  On or around March 2015, he called AFBC and spoke with a company representative. The representative told him he qualified for an income-based repayment program ("IBR program"), which would reduce the amount of his student loan to $0. The AFBC representative told him that AFBC would enroll him in the IBR program if he paid AFBC a $95 processing fee and a $1,200 program fee. Mr. Marshal did not know that he could apply for the IBR program directly through his loan servicer. The AFBC representative also told him that the U.S. government would forgive his entire loan balance after 10 years if he continued to work for Veterans Affairs. However, the representative neglected to tell him that his loan would still accrue interest during those 10 years.

d. Mr. Marshal initially believed that AFBC was affiliated with the government, or at least sanctioned by the government, because the representative told him he qualified for a government program and seemed very knowledgeable. AFBC ultimately consolidated his loans with a new lender, FedLoans, and told him his monthly loan payment was $0. AFBC also told him not to correspond with FedLoans.

e. From May 3, 2015 to October 3, 2016, AFBC withdrew $147.70 per month directly from his checking account. From November 2016 to March 2017, AFBC withdrew $47.70 monthly from his checking account. He understood that these payments went to the program fee and assumed that after he paid the $1,200 program fee, any funds that AFBC withdrew were going towards his loan balance.

f. In the fall 2016, Mr. Marshal became concerned about his loan and contacted the loan servicer, FedLoans. A FedLoans agent told him that he could have done the modification himself for free and recommended that he contact the Federal Trade Commission to report AFBC's practices. The agent also told him that his loan amount was increasing instead of decreasing, which he found confusing because he believed AFBC was submitting loan payments to his lender. He did not know what to do and was confused about payments to AFBC. He continued to let AFBC withdraw funds from his checking account because he did not want to let his loan to go into default.

g. In January 2017, he reviewed his contract with AFBC and noticed that AFBC charged him a $600 fee and a monthly $47.70 fee, in addition to the $1,200 program fee and $95 processing fee. He was shocked to discover these separate fees, which he believed AFBC slipped right past him. Nor does he know why AFBC charged him $600 or $47.70 per month. He hired AFBC to lower his monthly loan payments and did not purchase any other service from the company.

**C. Declarations From Former Employees Regarding the Scheme to Defraud**

15. The public record also contains numerous declarations signed under penalty of perjury from former employees of the Companies. Three of these declarations are summarized below. These are summaries only and not intended to capture every statement in the declarations.

16. Erica Bufano worked in the Sales and Operations Departments of AFBC and AMERITECH. Her declaration was filed on March 5, 2018 (ECF No. 52).

a. Ms. Bufano worked at AFBC and AMERITECH's offices in Rohnert Park, CA, located in the Northern District of California. She was hired in early

2015 by Brandon FRERE and Cameron Henry, who she refers to as the companies' owners. She noted that FRERE had an office in the companies' headquarters and that managers would frequently come to him with questions.

b.  Her first job was answering calls from consumers inquiring about student loan assistance. She was given a script and trained by Mr. Henry and an individual named Tyler Colt on how to sell the company's services. She was "coached" on how to convince clients to inflate their family size on their student loan repayment reduction applications. Henry and Colt instructed her to tell clients that nearly anyone could count as a family member, including people the clients gave Christmas presents to. According to Ms. Bufano, the companies' owners and managers knew the company was submitting student loan repayment reduction applications to lenders that contained false information.

c.  AFBC charged consumers several hundred dollars to enroll them in federal student loan assistance programs. AFBC also charged consumers a recurring monthly fee for a financial education membership. Consumers she spoke to were confused about AFBC's payment structure and thought that their monthly payments were going towards their student loan.

d.  After approximately six months, Ms. Bufano transferred to AFBC's operations department. There were not enough employees in the department to handle all of the client files and applications. As a result, AFBC left many client loans in forbearance while it was supposedly working on loan repayment reduction applications. According to her, "Many people paid AFBC money and the company did nothing for them."

e.  After the company changed its name to AMERITECH, she was told to stop working on AFBC client files and instead focus on AMERITECH files because those clients were paying more.

      f.  Ms. Bufano's manager and several employees also told her that AFBC paid someone at the Better Business Bureau to maintain an A+ rating despite consumer complaints.

17.     Kelly Cretcher worked as an account executive in the sales department for AFBC between January 2014 and July 2014.  Her declaration was filed on April 19, 2018 (ECF No. 107).

      a.  Ms. Cretcher was hired by FRERE and Cameron Henry, who represented themselves to be the owners of AFBC.

      b.  Her training consisted of reading through a sales script along with various rejections and rebuttals for when potential clients would ask questions or challenge sales representatives.

      c.  Part of the criteria used to qualify a client was their reported family size. The higher the family size, the more likely that a client would qualify for a lower monthly payment. As part of the training, she recalls FRERE encouraging her to exaggerate the definition of family size when explaining it to a client.

      d.  She remembers FRERE telling her that anyone you had over for dinner, your kid's friend, or someone that used your Netflix account could all be considered "family members."

      e.  When she questioned FRERE about the legality of what they were doing, he claimed that it was based on a "loophole" and that he had consulted with attorneys who told him what they were doing was legal.

      f.  Similar to Ms. Bufano's experience, Ms. Cretcher was told by Cameron Henry that FRERE paid someone at the Better Business Bureau to maintain the company's A rating and that FRERE was also helping this individual with his student loans.

18.     Danielle Kinney resides in California. Her declaration was filed on April 16, 2018 (ECF No. 110).

      a.  From February 2016 through May 2017, Kinney, while a university student, worked in the Operations Department of Ameritech Financial ("AMERITECH") located in Rohnert Park, California. As an employee in the Operations Department, Kinney's job was to handle customer service issues for AMERITECH's clients.

b. AMERITECH charged customers an enrollment fee, a monthly membership fee, and a fee to submit student loan repayment applications to customers' lenders. AMERITECH bundled all aforementioned fees together into one monthly payment charged to the customer.

c. Kinney did not think AMERITECH had the right to charge consumers a monthly membership fee. According to Kinney, many customers did not understand what they were paying for, and some customers believed their monthly membership fee was being applied to their student loan debt by means of AMERITECH making monthly payments to the loan servicer.

d. AMERITECH used third-party payment processing companies ("payment processors") to collect fees from customers. The payment processors were supposed to hold fees in escrow until AMERITECH had completed the work guaranteed to the customer.

e. In 2016, AMERITECH used a payment processor called Global Client Solutions ("GCS"). However, in approximately January 2017, AMERITECH switched to a different payment processor. After the switch, the owner of AMERITECH, Brandon FRERE wanted to withdraw approximately $500,000 from the GCS escrow accounts. FRERE asked Kinney and other employees in the Operations Department to help him withdraw the $500,000. FRERE directly supervised the project to withdraw the $500,000, an assignment he referred to as "GCS Project." The GCS Project was originally supposed to take 60 days to accomplish, but the GCS Project was still ongoing when Kinney left AMERITECH in May 2017.

f. FRERE was in AMERITECH's office often and was very involved in AMERITECH's Operations Department. FRERE attended AMERITECH employee meetings, but never spoke directly to customers.

g.  FRERE's GCS Project required AMERITECH staff to contact approximately
1,200 customers and persuade them to sign a form in which they stated
AMERITECH had completed the promised work on their student loans.
FRERE instructed Kinney and other staff members to email and send text
messages to customers and, "get them to reply yes," even if AMERITECH
had not performed any work on their loans. Once the forms were signed,
AMERITECH staff submitted the forms to GCS and requested funds from the
customer's escrow account. Kinney estimated that AMERITECH had not
completed work on 75% of the loans for which they submitted forms to GCS.

h.  Kinney was uncomfortable collecting funds from customers for whose loans
she knew AMERITECH had not performed any work. Kinney raised her
concerns twice at GCS Project staff meetings. Additionally, Kinney wrote
down the names of approximately 50 customers whose escrow funds were
improperly collected by AMERITECH from GCS.

i.  Kinney also had concerns about AMERITECH's policy on calculating a
customer's family size for student loan repayment applications.
AMERITECH's sales staff told customers they could include anyone they
financially supported when calculating their family size for purposes of
student loan repayment applications, to include people for whom they bought
Christmas gifts or for whom they paid phone bills. On average,
AMERITECH's Operations Department received approximately 100
telephone calls a day from customers who were confused about how to
calculate family size for loan repayment applications. Student loan servicers
were questioning customers' calculations of family size and routinely denying
applications. When customers called to ask questions, AMERITECH sales
staff gave customers information which conflicted with information the
customers had received in letters from their loan servicers.

j.  Kinney thought AMERITECH refunded customers who were double charged
or who had other technical problems. "Upper management" at AMERITECH
dealt with refund requests.

k.  Kinney was fired in May 2017 because she refused to follow orders to submit
false paperwork as required by the GCS Project.

**D.  Evidence of Wire Transactions**

19.  As stated above, an essential part of the wire fraud scheme was to enrich FRERE
and his family members with proceeds fraudulently obtained from the victims.

20.  According to Judge Armstrong's Order, the evidence presented by the FTC after
its review of the Companies' records shows that FRERE transferred over $3.164 million from
the Companies' accounts to his personal account.[13]   Ortiz Decl. (ECF No. 66) ¶¶ 33-38 & Atts.
Z, AA, BB; George Decl. (ECF No. 58) ¶ 26 & Att. P.

21.  Bank records also show the dissipation of over $128,000 to airlines, hotels,
resorts, casinos, cruise lines, and similar companies; over $202,000 to automotive and
motorsports companies; and over $253,000 to companies that provide building, landscaping, and
related supplies and services. George Decl. ¶¶ 15-17 & Atts. H-J.

22.  In addition, FRERE directed payments of over $864,000 to members of his family
and family-owned businesses. Id. ¶¶ 11-14 & Atts. D-G; Ortiz Decl., Att. J.[14]

23.  The George Declaration summarizing the FTC's forensic accounting of certain
payments from AFBC and AMERITECH is attached here and incorporated by reference as
**Exhibit B** in support of the requested criminal complaint.

---

[13]    As with the descriptions above, the citations to the public record (ECF) that follow are
taken from the Court's Order.  The George Declaration is also attached for reference as Exhibit
B.

[14]    FBI and IRS are continuing to investigate and independently analyze FRERE's transfers.
We have not independently verified the FTC's accounting analysis.  As a preliminary matter, the
$2.4 million transfer to Andorra cited in the Court's Order at page 22 appears to be based on a
Report of Foreign Bank and Financial Accounts (FBAR) (Ortiz Decl., Att. AA).  Rather than
show a transfer, the FBAR, which was filed in 2017, shows the total value of the Andorra
account in 2015 as being $2,419,881.  ECF No. 66-27.

24.     Based on my review of bank records, I know that FRERE regularly transferred substantial amounts of money from the Companies' business accounts to his personal accounts. I also know that he controlled these accounts based on the same records, including signature cards associated with the accounts.

25.     FRERE also appears to have wired large amounts of fraudulently obtained proceeds to accounts he controlled overseas.

26.     For example, on September 8, 2016, FRERE wired $2,050,000 from his personal savings account at Bank of America (account ending in 7970) to a foreign bank account bearing his name (Brandon Frere ATF Lancel Trust) located in Andorra.

27.     On August 17, 2017, FRERE again wired $1,300,000 from his personal savings account at Bank of America (account ending in 7970) to a foreign bank account bearing his name (Brandon Frere ATF Lancel Trust) located in Andorra.

28.     In addition, on April 1, 2018, FRERE's personal checking account at Redwood Credit Union (account ending in 2056) had a beginning balance of $54,948.25.

29.     On April 19, 2018, FRERE received two deposits from accounts that he controlled. The first was from the Redwood Credit Union business account of FEBC (account ending in 2076) for $940,865. The second deposit was from the Redwood Credit Union business account of AFBC (account ending in 0966) for $547,075.

30.     Less than two weeks later, on April 30, 2018, FRERE wired $1,075,000 from this same personal checking account at Redwood Credit Union (account ending in x2056) to a foreign bank account bearing his name (Brandon Frere ATF Lancel Trust) located in Luxembourg (EFG Bank Luxembourg SA).

31.     The criminal investigation to date has identified in excess of $9,000,000 wired by FRERE to bank accounts in Andorra and Luxembourg between June 2015 and April 2018.[15]

---

[15] Some of this money (approximately $1.6 million) appears to have been transferred back to accounts in the United States, but this still leaves in excess of $7,000,000 overseas.

32.     Based on the investigation, including my review of bank records, and FRERE's pattern and practice, I believe the money wired from FRERE's personal accounts to foreign bank accounts bearing his name in both Andorra and Luxembourg came from company accounts he controlled and that the money from those accounts was derived from the fraudulent activity described above.  These international wires were an essential part of the scheme to defraud because they were designed, among other things, to personally enrich FRERE with the ill-gotten proceeds of his fraud.

33.     Based on my training and experience, I further know that a wire transfer originating from a U.S. bank within the United States of America to a financial institution in Andorra or Luxembourg would have used a foreign wire to complete the transfer of funds. Based on a conversation law enforcement had with a representative of Redwood Credit Union on December 4, 2018, I also know that Redwood Credit Union does not maintain any branch offices outside of the Northern District of California.

## IV.   RISK OF FLIGHT AND REQUEST FOR SEALING

34.     Because this investigation is continuing, disclosure of the Complaint, this affidavit, and/or the arrest warrant will jeopardize the progress of the investigation.  Disclosure would give the targets of the investigation an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee from prosecution.

35.     In addition, on December 3, 2018, I learned from law enforcement sources that on November 28, 2018, FRERE purchased an airline ticket to fly to Cancun, Mexico, departing on December 5, 2018, with no apparent companions.  The ticket was a roundtrip ticket, with his return flight scheduled for December 9, 2018.  On December 4, 2018, I spoke with the Receiver who had been appointed by Judge Armstrong to oversee the Companies.  The Receiver informed me that on November 29, 2018 (the day after FRERE booked his ticket), FRERE transferred approximately $400,000 out of three Bank of America accounts associated with the Companies. Approximately $179,000 of this amount went to FRERE's personal account.  Roughly $30,000

was transferred to members of FRERE's family, and the remainder was sent to lawyers.[16]  Based on the timing of FRERE's international travel, his recent substantial transfers of money, millions of dollars in funds that FRERE has already transferred overseas, and the issuance of the Preliminary Injunction on November 29, 2018, I believe FRERE is a significant flight risk and may be in the process of fleeing the country to avoid criminal prosecution and/or the consequences of the FTC's fraud action against him.

36.     Accordingly, I request that the Court issue an order sealing the Complaint, this affidavit, and the arrest warrant until further order of this Court.

## V.     CONCLUSION

37.     Based on the foregoing facts and my training and experience, I believe there is probable cause to believe that from in or about at least 2014 to November 2018, Brandon FRERE committed wire fraud in violation of Title 18, United States Code, Section 1343, and that on the dates alleged paragraphs 26, 27, and 30, FRERE caused wire communications to be sent in interstate or foreign commerce in furtherance of the scheme to defraud.

CHRISTOPHER J. BOGNANNO
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before
me this __5__ day of December, 2018.

HON. SALLIE KIM
UNITED STATES MAGISTRATE JUDGE

---

[16] According to the Receiver, the parties were informed by phone by the Court's clerk at approximately 11:00 AM on November 29, 2018, that the case management conference (CMC) scheduled for later that day was going to be moved because the Court would be ruling on the motion for preliminary injunction soon.  An ECF notice rescheduling the CMC issued at approximately 11:42 AM the same day.  At approximately 1:46 PM, FRERE "looted" the Companies' accounts by withdrawing the amounts described above.  The Order granting the Motion for Preliminary Injunction was filed approximately 45 minutes later.