# EXHIBIT A



3   18   71724

SK

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No:  C 18-00806 SBA |
| Plaintiff, | Related to Case No: C 17-04817 SBA |
| vs. | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| AMERICAN FINANCIAL BENEFITS CENTER, a corporation, also d/b/a AFB and AF STUDENT SERVICES, et al., | Dkt. 22 |
| Defendants. | |

The Federal Trade Commission ("FTC") brings the instant consumer fraud action against Brandon Frere ("Frere") and American Financial Benefits Center ("AFBC"), Ameritech Financial ("Ameritech"), and Financial Education Benefits Center ("FEBC") (collectively "the Companies," and together with Frere "Defendants").  The matter is presently before the Court on the FTC's Motion for Preliminary Injunction.  Having read and considered the papers filed in connection with this matter, and being fully informed, the Court hereby GRANTS the motion, for the reasons stated below.[1]

# I.     BACKGROUND

## A.     THE PARTIES

The FTC is an independent agency of the United States government.  Compl. ¶ 4, Dkt. 1.  The FTC is charged with the enforcement of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41 *et seq*., which prohibits, *inter alia*, "unfair or deceptive acts or practices in or affecting commerce."  Id. § 45(a)(1).  The FTC is also charged with the

---

[1] The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

enforcement of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. §§ 6101 *et seq.* Pursuant to its authority under the Telemarketing Act, the FTC promulgated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. pt. 310, which prohibits deceptive or abusive telemarketing acts or practices. <u>See</u> 15 U.S.C. § 6102(a); 16 C.F.R. §§ 310.3-310.4. A violation of the TSR constitutes a violation of the FTC Act. <u>See</u> 15 U.S.C. §§ 57a, 6102(c).

AFBC was incorporated in California in February 2011. Compl. ¶ 6. Ameritech and FEBC were incorporated in California in October 2015. <u>Id.</u> ¶¶ 7-8. Frere is the founder, majority owner, and CEO of the Companies. <u>Id.</u> ¶ 9. Defendants have "advertised, marketed, distributed, or sold student loan debt relief services to consumers throughout the United States." <u>Id.</u> ¶¶ 6-9. In conducting the business practices at issue in this action, the Companies have operated as a common enterprise. <u>Id.</u> ¶ 10. Frere "formulated, directed, controlled, had the authority to control, or participated in the acts and practices" of the Companies that constitute the common enterprise. <u>Id.</u>

**B.   STUDENT LOAN FORGIVENESS AND REPAYMENT PROGRAMS**

The Department of Education ("ED") offers a limited number of student loan forgiveness programs. Compl. ¶ 15. One such program is Public Service Loan Forgiveness ("PSLF"), which allows borrowers employed in the public sector to have a portion of their loans forgiven after making timely payments for a period of ten years. <u>Id.</u> ¶ 16. Another such program is income-driven repayment ("IDR"), which enables borrowers to reduce their loan payments based on a percentage of their discretionary monthly income. <u>Id.</u> ¶ 17. After making timely payments for a period of 20 or 25 years under an IDR program, borrowers may have a portion of their loans forgiven. <u>Id.</u> Borrowers can apply for PSLF, IDR, and other such programs through the ED or their student loan servicers at no cost; the programs do not require the assistance of a third-party or the payment of application fees. <u>Id.</u> ¶ 19. While an application for an alternative repayment plan is pending, borrowers can request a forbearance, which allows them to stop making student loan payments. <u>Id.</u> ¶ 20. During a forbearance, interest continues to accrue and be capitalized. <u>Id.</u>

## C.     DEFENDANTS' BUSINESS PRACTICES

Since 2014 and continuing thereafter, Defendants have operated an alleged student loan debt relief enterprise.  Compl. ¶12.  They advertise student loan payment reduction and forgiveness, and purport to provide both a document preparation service and a "financial education" membership program.  Defendants collect advance fees of $600 to $800, purportedly to prepare and submit documents to enroll consumers in PSLF, IDR, and other alternative repayment plans.[2]  They also collect enrollment fees of $100 to $1,200 and monthly fees of $49 to $99 for the financial education membership, which includes access to various services that are completely unrelated to student loans, such as "Key Ring & Luggage Protection" and "Auto Buying Service and Maintenance Discounts."  Defendants have collected over $28 million from consumers through these fees.  Id. ¶ 13.  As discussed below, Defendants engage in deceptive and abusive acts and practices in connection with the advertising and furnishing of these services.[3]

### 1.     Fixed Payments and Loan Forgiveness

As stated above, the ED offers IDR plans that allow eligible borrowers to limit their monthly loan payments to a percentage of their discretionary monthly income.  IDR and PSLF plans may also enable borrowers to have portions of their loans forgiven.  Only the ED can determine a borrowers' eligibility for these plans.  Income and family size determine both borrowers' eligibility and the amount of their monthly payments, and these variables must be recertified annually.  Because income and family size likely fluctuate over the life of the loan, monthly payment amounts can vary considerably from year to year.  It is therefore not possible to promise fixed monthly payments for the life of the loan.

---

[2] Throughout this Order, the Court refers to Defendants' customers or potential customers as consumers.  Defendants market their services to individuals with outstanding student loans, whom the Court refers to as borrowers.

[3] The record on the instant motion is voluminous.  For brevity, the Court cites only select exhibits for representative examples of Defendants' business acts and practices.  The Court notes, however, that it has reviewed many of the exhibits in their entirety, not just those portions cited by the parties.  Based on its review, the Court finds that there is ample evidence to support the finding that Defendants engage in the deceptive and abusive acts and practices described below.

Additionally, obtaining loan forgiveness requires a minimum of 10, 20, or 25 years of qualifying payments, depending on the plan in which a borrower is enrolled. Because payment amounts may increase over time, the loan may be paid off before any amount can be forgiven. It is therefore not possible to promise loan forgiveness in any amount, let alone a specific amount. Despite the foregoing, Defendants promise consumers fixed monthly payments and loan forgiveness under their program.

Defendants disseminate direct mail solicitations advertising "student loan payment reduction and forgiveness." Ortiz Decl., Att. S, Dkt. 66; Rhode Decl., Att. D, Dkt. 67. The mailers represent that the addressee is "eligible" or "pre-qualified" for the programs. Id. In some instances, the mailers advertise payments and savings in specific dollar amounts. Id. The mailers create a sense of urgency by stating that the offers are available only for a limited time. Stiner Decl., Ex. QQ, Dkt. 70. The mailers do not identify Defendants by name; rather, they purport to be from the "Student Loan Department." Id. Notably, the mailers do not advertise any financial education membership program. Id. Finally, the mailers include a toll-free number for consumers to call for more information.

During the subsequent sales calls, Defendants continue to misrepresent the costs and features of the federal repayment plans. Sales agents represent that callers have been qualified for the promised repayment plan. Stahl Decl., Att. G at 9:2-6, Dkt. 69; Stiner Decl., Att. BB at 47:11-13. Agents further represent that, under "the program," consumers will make lower monthly payments for a fixed period, after which the remaining balance of their loans will be forgiven. Stiner Decl., Att. BB at 22:2-24:13. Agents represent that consumers will save a specific amount of money. Id.

For example, agents instruct callers to make a chart, on which they are told to record various sums. Stiner Decl., Att. BB at 22:2-24:13. Callers are instructed to write "current" on one side of the chart and "program" on the other. Id. at 22:13-16. Under "current," the callers are told to record the payment amount of their current repayment plan and the purported total cost over the life of the loan. Id. at 22:18-23:1. Under "program," callers are told to record their new payment amount under "the program" and—assuming that sum

will remain fixed for the entire repayment period—the total cost of "the program." <u>Id.</u> at 23:3-24:4.[4]  Agents advise that, after callers make a set number of payments, the remaining balance of their loans will "be forgiven." <u>Id.</u> at 24:6-8.  Agents instruct callers to record a final sum, representing the "total saved." <u>Id.</u> at 24:6-10.  Agents advise that "the goal is not to pay off your federal student loan," but rather, to pay as little as possible to obtain the maximum discharge.  Gonzalez Decl., Att. B at 56:11-14, Dkt. 59.

During sales calls, Defendants also obfuscate their fee structure, conflating their fees and borrowers' loan payments by referring to these amounts collectively as the consumers' payments under "the program."  Ortiz Decl., Att. ZZ at 10:25-11:19; <u>see also</u> <u>id.</u> at 12:4-9 ("These are all federal programs, and payments need to be made on time.").  The quoted monthly, yearly, and total costs of "the program" include, not only the borrowers' loan payments, but also fees paid to Defendants.  While fees will be discussed in greater detail below, the Court preliminarily notes that Defendants' representations regarding the cost of "the program" are misleading in several respects.

First, payments under "the program" are juxtaposed with consumers' "current" payments, which include only their student loan payments.  Thus, agents are not comparing apples with apples (i.e., payments under the current repayment plan and payments under the alternative repayment plan).  Second, payments under "the program" include a monthly fee for the "financial education" membership, a service that is unrelated and in no way a prerequisite to a borrower's participation in an alternative repayment plan.  It is telling that Defendants never present consumers with the (presumably much greater) savings that could be achieved under an alternative repayment plan alone, *without* the membership program.

---

[4] The agent states: "And then through the program, the first 11 months your payment will be slightly higher. It's basically the period of time where the majority of the fees are covered for all the work that's done. So for the first 11 months, your payment will be [$]207. . . . And then on the 12th month, your payment will drop down to $126.81.  So if you want to write . . . $126.81. . . . And then times 12 gives you . . . a new annual outflow of about [$]1,521. . . . And then again, like I said before, you only have to pay into the program for ten years for 120 payments. So 120 payments of [$]126 comes out to [$]15,217. So write down [$]15,217. . . . That's total program costs.  That's the money that you're going to put into the program."

### 2. Program Eligibility and Family Size

Defendants also misrepresent consumers' eligibility for alternative repayment plans and the low monthly payments that are quoted. As stated above, factors such as income and family size determine whether a borrower qualifies for a repayment plan and the monthly loan payment amount. Regulations limit those included in "family size" to the borrower, the borrower's spouse, children who receive more than half their support from the borrower, and other persons who both live with and receive more than half their support from the borrower. 34 C.F.R. § 682.215(a)(3).

Defendants' agents enroll the maximum number of consumers by "aggressively inflating family size figures." Hamilton Decl. ¶ 10, Dkt. 60; see also Martinez Decl. ¶ 8, Dkt. 64 ("It was common practice to exaggerate family size figures in order to get people to qualify."). During sales calls, agents counsel consumers to report higher family sizes by misrepresenting the level of support required to include someone as a family member.

For example, one sales representative told a caller:

> Now, support includes any kind of money, gifts, loans, housing, food, clothing, car, medical or dental, payment of college costs. Do you help anybody -- if you have somebody on your cell phone plan; if you have somebody on your gym membership, they're considered part of your family. And we just had Christmas. You know, if you bought presents, clothes, watch, earrings, toilet paper, they're a part of your family. Okay?

Stiner Decl., Att. DD at 20:6-14. The caller reported that he was "still at home" and asked whether his "mom, dad, and . . . brother" should be included in his family size. Id. at 20:19-21. The agent responded, "Absolutely." Id. at 20:22. After adding the borrower and his fiancée—to achieve an already inflated family size of five—the agent further inquired:

> [I]s there any other maybe friends that come . . . stay with you that you . . . feed them, you clothe them . . . go hang out . . . go to see a movie, you pay for them . . . you drive them around, gas, you know, take them to work? Is there . . . anybody that you bought Christmas presents for, maybe a niece, nephew, somebody that you would be able to add in, somebody in your family?

Id. at 21:4-13.

When prospective customers express skepticism, Defendants make additional false or unsubstantiated representations to reassure them. Agents emphasize that family size is quite broad and more inclusive than "dependents." Id. at 18:7-14; Ortiz Decl., Att. LL at 10:13-18 (stating that the definition of family size is "rather broad" and explaining that, even though the agent is "a dad with a daughter," when he includes all the people he supports "under this definition," his family size is "probably . . . closer to eight"). Agents advise that family size is "pretty much just an arbitrary number that you as a client determine and provide me." Stiner Decl., Att. DD at 18:17-18; see also id. at 19:6-8 ("So, pretty much, it's just a number that's determined by you, just something that I got to put to keep the process moving."). Agents further advise that consumers will not be asked to verify or prove a family size of less than ten. Ortiz Decl., Att. LL at 13:12-20.

Consumers trust Defendants' purported expertise in determining family size. Vildasol Decl. ¶ 5, Dkt. 71 ("[The agent" informed me that this was a new program and that he was an expert. I trusted him."). Consumers may enroll in Defendants' program only to later learn that they do not qualify for an alternative repayment plan or the quoted monthly payments. Id. ¶ 10 (consumer was enrolled in Defendants' program from June 2014 to September 2015 before his lender advised that he did not qualify for PSLF and claimed that he had unlawfully inflated his family size to qualify for a forbearance). In other cases, consumers may continue to be enrolled in a repayment plan for which they do not actually qualify. This can significantly set back consumers' repayment of their student loans and potentially expose them to additional liability. Id. ¶¶ 2, 14 (consumer paid Defendants $2,491 in fees while his student loans were kept in forbearance for 15 months; his loan balance increased from approximately $70,000 to $75,000 due to accrued interest).

### 3. Defendants' Fees

Defendants collect various fees from consumers. Defendants charge between $600 to $800 for document preparation services and anywhere from $100 to $1,200 to enroll consumers in the financial education membership program. Archibald Decl., Att. B, Dkt.

50; Vildasol Decl., Att. A.  Defendants also charge a continuing monthly fee, usually between $49 and $99, for the financial education membership program.  Id.

### a.   Advance Fees in Violation of the TSR

The TSR generally prohibits sellers and telemarketers of any debt relief service from charging advance fees.  16 C.F.R. § 310.4(a)(5).  A debt relief service provider cannot collect fees before it has successfully reduced or otherwise altered the terms of the consumer's debt and the consumer has made at least one payment on the reduced or altered debt.  Id.  If various safeguards are employed, a debt relief service provider may hold advance fees in an escrow account.  Id.  The use and terms of the escrow account must be disclosed to consumers in a clear and conspicuous manner.  Id. § 310.3(a)(1)(vii)(D).

Defendants collect payment information from consumers during the initial sales calls.  Stiner Decl., Att. CC at 17:17-18:12.  Consumers pay all or a portion of the document preparation fee and financial education membership program enrollment fee almost immediately, and often long before they are enrolled in a new loan repayment plan.  Archibald Decl. ¶¶ 7, 9-11, 13 (consumer enrolled 1/8/16; first payment deducted 2/5/16; forbearance notice received 6/9/17; IDR adjustment received 7/4/17); Vildasol Decl. ¶¶ 4, 8, 10 (consumer enrolled 4/3/14; first payment deducted 5/30/14; consumer learned his loan was in forbearance and he did not qualify for PSLF in September 2015).

Prior to 2015, AFBC collected advance fees directly from consumers.  In late 2015, Defendants formed Ameritech and FEBC and partitioned their document preparation and financial education membership services.  Ortiz Decl., Att. EEE at 3.  Since that time, Ameritech has held advance fees for its services in escrow accounts.  Defendants claim not to deduct funds from the escrow accounts until fees have been "earned" under the TSR.  Id., Att. DDD at 8, 11.  However, Defendants provide conflicting statements as to when exactly that occurs and acknowledge that fees may be deducted before consumers are enrolled in an alternative repayment program and/or before they make their first payment thereunder.  Id., Att. CCC ¶ 21 (Ameritech accepts payment "after the customers receive their results"); id., Att. DDD at 15 (Ameritech does not accept payment until customers are

accepted into an alternative repayment plan and make a payment thereunder, "[e]xcept in cases of forbearances" ); id., Att. FFF at 3 (Ameritech accepts payment "after the company completes and submits the consumer's documents").  Defendants have also failed to clearly and conspicuously disclose the use and terms of the escrow accounts.

*b.*    *Deceptive Monthly Fees*

As discussed briefly above, Defendants also charge a continuing monthly fee for the "financial education" membership program.  This fee is encompassed within the program costs quoted to consumers.  Defendants represent that this fee is tied to consumers' enrollment in an alternative repayment plan and that some or all of the monthly payments under "the program" are applied to consumers' outstanding loan balance.  Archibald Decl. ¶¶ 4, 13, 15; Vildasol Decl. ¶¶ 7, 11; Stiner Decl., Att. BB at 22:2-24:10 (describing costs under "the program").  For example, when a consumer asked, "On top of my other loans, I have to pay now you guys," the sales agent responded: "So it's a . . . part of the program. It's a part of . . . that monthly amount that I had . . . told you. So with the program, part of it is being paid toward . . . the enrollment fee, and then once it drops, it goes straight to your loan servicer, and it partners with that."  Ortiz Decl., Att. BBB at 51:4-13.  This is false.

When pressed, Defendants admit that their monthly fee pays for a financial education membership program; however, they generally obscure this fact.  Defendants do not advertise the financial education membership program on their mailers and infrequently mention it during sales calls.  When the membership is mentioned on sales calls, agents describe it as a complimentary service.  Stiner Decl., Att. CC at 36:12-37:17 (describing the membership as "a free account").  Curiously, monthly payments for the financial education membership program continue for the term of consumers' student loans, falsely making it appear that the fees are related to their continued enrollment in an alternative repayment plan.  Stiner Decl., Att. BB at 22:2-24:10.  In furtherance of this misperception, Defendants represent that canceling enrollment in "the program" will also terminate a borrower's enrollment in an alternative repayment plan and return him/her to a standard repayment plan.  Id., Att. CC at 26:7-12; Ortiz Decl., Att. BBB at 53:16-21.  Finally, if consumers

miss a payment for the financial education membership program, Defendants send correspondence suggesting that the consumer is at risk of falling behind on his/her student loan payments. Sills Decl., Att. D, Dkt. 68 (including "RE: Student Loan Payment" and urging swift action to "get your file back on track").

Approximately ninety percent of consumers who enroll with Ameritech also enroll in FEBC's "financial education" membership program. Ortiz Decl., Att. GGG at 2. Former customers aver that they would not have knowingly enrolled in or paid for such a program, however. Archibald Decl. ¶¶ 14-16; Sills Decl. ¶ 8. This is unsurprising, given that consumers contact Defendants for the express purpose of reducing monthly expenses.

### 4.    Other Practices

Defendants engage in other practices that facilitate the deceptive and abusive practices described above. In brief, after convincing a consumer to enroll in "the program," sales agents email lengthy and confusing contracts that the consumer is required to sign electronically during the sales call. Archibald Decl. ¶ 5; Vildasol Decl. ¶ 6. Sales agents reassure consumers by stating that the contracts merely reiterate information that has been provided throughout the call. Stiner Decl., Att. BB at 53:17-60:8. After the consumer has signed the contracts, he/she is transferred to the "Verification Department." Ortiz Decl., Att. DDD at 7. Another representative then quickly reads through a script providing important legal qualifications and clarifications that often conflict with sales agents' earlier representations. Stiner Decl., Att. BB at 63:22-83:18; id., Att. CC at 43:8-70:78.

Defendants interfere with communications between borrowers and their loan servicers, making it more difficult for consumers to discover Defendants' deceptive practices. Defendants require consumers to provide highly sensitive information, including Social Security numbers and Federal Student Aid ("FSA") login IDs, passwords, and security questions. Archibald Decl. ¶¶ 8, 12. In some cases, Defendants change borrowers' FSA passwords and contact email addresses, causing loan-related correspondence to be sent directly to Defendants and locking consumers out of their own student loan accounts. Lee Decl. ¶ 13, Dkt. 62 (AFBC.Confirmation@afcenter.com input as contact email address for

199 borrowers with one loan servicer). Additionally, Defendants routinely place borrowers' loans in forbearance, sometimes for lengthy periods, during which time borrowers are not required to make loan payments and loan servicers are prohibited from contacting borrowers. Id. ¶ 11. Thus, consumers may be unaware that their loans are in forbearance, continuing in the belief that their monthly payments to Defendants are being applied to their student loans. Archibald Decl. ¶ 13; Vildasol Decl. ¶¶ 10, 14.

### D. PROCEDURAL HISTORY

The FTC initiated the instant consumer fraud action on February 7, 2018. Dkt. 1. The Complaint alleges claims for: (1) Violations of the FTC Act - Deceptive Student Loan Debt Relief Representations; (2) Violations of the TSR - Advance Fee for Debt Relief Services; and (3) Violations of the TSR - Material Debt Relief Misrepresentations. The FTC seeks injunctive and other equitable relief, as well as monetary relief in the form of restitution, refund of monies paid, and disgorgement of ill-gotten monies.

The FTC filed the instant motion for preliminary injunction, Dkt. 22, after which Defendants filed a motion to dismiss, Dkt. 117. The Court issued an order to coordinate scheduling in this and a related action and set both motions for hearing on June 13, 2018. Dkt. 122.[5] Upon the parties' request, the Court referred the action for an early settlement conference before Magistrate Judge Laurel Beeler. Dkt. 126. The Court then took the pending motions under submission. Dkt. 138. The parties participated in a settlement conference on July 2, 2018, and further settlement discussions thereafter; nevertheless, the action did not settle. Dkt. 149, 151. On August 8, 2018, the Court issued an Order Denying Defendants' Motion to Dismiss. Dkt. 157 ("Order on MTD").

In support of the instant Motion for Preliminary Injunction, Dkt. 22 ("Mot."), the FTC filed 22 declarations along with attached exhibits, which total over 2,400 pages.

---

[5] On August 19, 2017, the Companies filed a declaratory relief action against the FTC. American Financial Benefits Center v. FTC, Case No. 17-cv-04817-SBA, Dkt. 1. Upon the filing of the instant action, the Court deemed the two actions related. Id., Dkt. 38. On May 29, 2018, the Court dismissed the Companies' declaratory relief action for lack of subject matter jurisdiction. Id., Dkt. 51. The Companies have appealed. Id., Dkt. 53.

Dkt. 50-71.  Defendants filed an Opposition to the FTC's motion, Dkt. 79 ("Opp'n"), along with over 1,400 pages of supporting declarations and exhibits, Dkt. 79-1 through 79-105. Thereafter, the FTC filed a Reply in support of the motion, Dkt. 103 ("Reply"), along with nearly 500 pages of additional supporting declarations and exhibits, Dkt. 104-115.

After the close of briefing, Defendants filed an Administrative Motion to Consider Additional Evidence in Ruling on FTC's Motion for Preliminary Injunction, or, in the Alternative, to Hold Evidentiary Hearing.  Dkt. 140.  The FTC opposes the administrative motion.  Dkt. 142.  Defendants also filed a Motion for Leave to File Reply to FTC's Opposition to Defendants' Administrative Motion, Dkt. 146, along with the proposed reply brief, Dkt. 146-1.  The FTC opposes that motion a well.  Dkt. 147.

## II.    LEGAL STANDARD

The FTC may file suit in a district court whenever it has reason to believe (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the FTC, and (2) that the enjoining thereof would be in the interest of the public.  15 U.S.C. § 53(b).  Pursuant to Section 13(b) of the FTC Act, a district court may issue a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."  Id.  "Section 13(b), therefore, 'places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction.'"  FTC v. Affordable Media, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting FTC v. Warner Commc'ns, Inc., 742 F.2d 1156, 1159 (9th Cir. 1984)); see also FTC v. World Wide Factors, Ltd., 882 F.3d 344, 346 (9th Cir. 1989) ("harm to the public interest is presumed").  In deciding whether to issue a preliminary injunction in a statutory enforcement action, a district court need only (1) consider the likelihood that the FTC will succeed on the merits; and (2) balance the equities.  Affordable Media, 179 F.3d at 1233.  The district court's decision will be reversed only if the court abused its discretion by basing its decision on an erroneous legal standard or on clearly erroneous factual findings.  Id.

## III.    DISCUSSION

The FTC seeks a preliminary injunction, including the appointment of a neutral receiver, to halt Defendants' purportedly deceptive debt relief operation.  Such relief, the FTC contends, is warranted to prevent further harm to consumers and to locate and secure assets and records without disrupting legitimate business activities.  Defendants oppose a preliminary injunction and object to the scope of the proposed relief.

### A.    TIMELINESS OF THE MOTION

As a threshold matter, Defendants assert that the motion for a preliminary injunction is untimely because the FTC spent months investigating the Companies and defending against the related declaratory relief action.  According to Defendants, such delay demonstrates that there is no urgency necessitating injunctive relief.  Defendants' assertion is legally unsupported and the premise underlying the assertion is unfounded.  The record shows that the FTC has conducted a diligent investigation.  <u>See</u> Reply at 11.  Such investigative efforts are time-consuming and essential to establish an adequate factual basis to initiate an action.  Indeed, the FTC must balance the need to protect consumers from further harm with the need to develop an evidentiary basis for its claims.  Further, in a consumer protection action such as this, the purported harm is ongoing.  Thus any alleged delay in moving for a preliminary injunction does not necessarily eliminate the opportunity for—or the necessity of—injunctive relief designed to curb consumer harm.

### B.    LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1.    The FTC Act

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  To prove a violation of Section 5, the FTC must show: (1) "a representation, omission, or practice that," (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "is material."  <u>FTC v. Stefanchik</u>, 559 F.3d 924, 928 (9th Cir. 2009) (quoting <u>FTC v. Gill</u>, 265 F.3d 944, 950 (9th Cir. 2000)).  "Deception may be found based on the 'net impression' created by a representation," rather than isolated words and phrases.  <u>Id.</u> (quoting <u>FTC v.</u>

_Cyberspace.Com LLC_, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.")).  A misrepresentation "is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"  _Cyberspce.Com_, 453 F.3d at 1201 (quoting _Cliffdale Assocs., Inc._, 103 F.T.C. 110, 165 (1984)).

The FTC contends that Defendants make material misrepresentations "about at least two aspects of their business: (1) that consumers qualify for plans that will permanently lower their monthly loan payments and/or lead to loan forgiveness; and (2) that consumers' monthly payments to Defendants will be applied toward consumers' student loan balances." Mot. at 17.  The Court finds that the FTC is likely to prevail on the merits of its claim under Section 5 of the FTC Act based on these misrepresentations.

As set forth in detail above, Defendants represent that consumers are pre-qualified for payment reduction and loan forgiveness, despite being unable to guarantee eligibility for alternative repayment plans.  In attempting to qualify consumers for such programs, Defendants also systematically encourage borrowers to inflate their family size, thereby enrolling them in programs for which they may not be eligible.  Defendants represent that, under "the program," consumers will make lower monthly loan payments for a fixed period, after which the remaining balance of their loans will be forgiven.  In many instances, Defendants advertise or promise payments and savings in specific dollar amounts.  Given the requirements of alternative repayment plans, however, Defendants cannot legitimately promise such results.  Finally, Defendants obfuscate their fee structure by conflating their fees and the borrowers' student loan payments.  Defendants falsely represent that payments under "the program" go toward consumers' loan balances and/or are related to their enrollment in an alternative loan repayment plan.  In reality, the sums collected by Defendants go toward a wholly unrelated "financial education" membership program.  Although the quoted "program" costs include the borrowers' loan payments, consumers remain obligated to make those payments directly to their student loan servicers.

These representations are material and likely to mislead consumers acting reasonably under the circumstances. <u>FTC v. Pantron I Corp.</u>, 33 F.3d 1088, 1095-96 (9th Cir. 1994) (express claims are presumptively material); <u>FTC v. Stefanchik</u>, No. C 04-1852 RSM, 2007 WL 1058579, at *5 (W.D. Wash. Apr. 3, 2007), <u>aff'd</u>, 599 F.3d 924 (9th Cir. 2009) (implied claims are presumptively material if the seller intended to make the claim or the claims go to the heart of the solicitation or the characteristics of the product or service).

Further, as persuasively argued by the FTC, the foregoing misrepresentations are not cured by disclosures buried in lengthy written contracts that consumers are rushed to e-sign at the end of Defendants' sales calls (i.e., *after* callers have agreed to enroll). <u>See</u> <u>Resort Car Rental Sys., Inc. v. FTC</u>, 518 F.2d 962, 964 (9th Cir. 1975) (The FTC Act is violated "if [a company] induces the first contact through deception," despite buyers later obtaining more information.); <u>FTC v. Gill</u>, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimer in contract that "consumers eventually sign" is insufficient where it "is not included in the representations"; "each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information"), <u>aff'd</u>, 265 F.3d 944 (9th Cir. 2001); <u>see also</u> <u>FTC v. Johnson</u>, 96 F. Supp. 3d 1110, 1139 (D. Nev. 2015) (fine print disclosures offered after consumers started the ordering process did not alter the misleading net impression created by the solicitation). As the numerous consumer complaints in this case make evident, Defendants' disclaimers are ineffective. <u>See</u> <u>Cyberspace.com</u>, 453 F.3d at 1201 (evidence that representations deceived consumers is "highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances").

Defendants counter that Ameritech's written and verbal disclosures are "robust" and "effectively convey that the company is not affiliated with the government, that the debt repayment document preparation services it offers can be performed by the borrower for free if they choose, that it is not a loan servicer, and that it does not negotiate with loan servicers or the ED." Opp'n at 18. They further assert that "Ameritech's scripts and agreements likewise make this clear." <u>Id.</u> Relying on the same, Defendants contend that the FTC is not likely to prevail on its claims. This showing is uncompelling.

1  Defendants devote portions of the background section of their brief to describing

2  their written and verbal disclosures (as well as other matters, including their purported

3  internal control and compliance measures).  They do not utilize these factual averments in

4  the argument section of their brief, however.  Rather, Defendants simply state that they

5  provide written and verbal disclosures.  Although Defendants acknowledge the FTC's

6  contention that their belated disclosures are inadequate, they do not meaningfully address

7  the argument.  Opp'n at 19.  Nor do they provide authorities to rebut those presented by the

8  FTC.  Instead, Defendants assert, without elaboration, that "Ameritech's business practices

9  and disclosures are wholly distinguishable from those that other courts have found

10  warranted injunctive relief."  Id.

11  Defendants' conclusory assertion is followed by a citation to <u>FTC v. Alliance</u>

12  <u>Document Preparation</u>, 296 F. Supp. 3d 1197, 1205 (C.D. Cal. 2016), along with a

13  parenthetical explaining that injunctive relief was granted in that case, brought as part of

14  the FTC's crackdown on student loan debt relief providers, where the defendants "made a

15  number of patently false disclosures."  Opp'n at 10.  A comparison of <u>Alliance Document</u>

16  <u>Preparation</u> and the instant case reveals that many of the false statements are markedly

17  similar, however.  296 F. Supp. 3d at 1205-08 (granting injunctive relief upon a finding that

18  the defendants had falsely claimed to "qualify or approve consumers for federal student

19  loan forgiveness or discharge programs" and to "permanently reduce the monthly payment

20  or the overall balance of the loan").  Thus, <u>Alliance Document Preparation</u> actually

21  supports the granting of injunctive relief in this case.

22  Accordingly, based on the evidence presented, the Court finds that the FTC is likely

23  to prevail on its claim under the FTC Act.[6]

24

25

26  [6] Later in their brief, Defendants argue that the FTC may not obtain injunctive relief based solely on evidence of past wrongdoing.  Not so.  See <u>Affordable Media</u>, 179 F.3d at

27  1238 (holding that the FTC need not offer evidence that the defendants were likely to repeat wrongful conduct).  Rather, to avoid injunctive relief, *Defendants* bear the burden of showing that "subsequent events [have] made it absolutely clear that the allegedly wrongful

28  behavior cannot reasonably be expected to recur."  Id.  They have not satisfied this burden.

**2.    The TSR**

The TSR prohibits deceptive and abusive telemarketing acts or practices, including certain acts or practices by sellers or telemarketers of any "debt relief service." 16 C.F.R. §§ 310.3, 310.4.[7]  In relevant part, the TSR prohibits any seller or telemarketer from misrepresenting, directly or by implication, "[a]ny material aspect of any debt relief service." Id. § 310.3(a)(2)(x).  The TSR also prohibits any seller or telemarketer from "requesting or receiving payment" of advance fees for any debt relief service—i.e., fees requested or received prior to the seller or telemarketer successfully renegotiating, settling, reducing or otherwise altering the terms of at least one debt pursuant to an agreement or plan executed by the consumer and the consumer making at least one payment pursuant to that agreement or plan. Id. § 310.4(a)(5)(i).

The FTC contends that Defendants violate the TSR by misrepresenting material aspects of their services and requesting or receiving advance fees.  Defendants counter that the FTC cannot prevail on claims under the TSR because: (1) they do not provide a "debt relief service," rendering the TSR inapplicable; and (2) even if it applies, they comply with the advance fee provisions by partitioning their services and utilizing escrow accounts.

As a threshold matter, the Court notes that the FTC has demonstrated a likelihood of success on its claim under Section 5 of the FTC Act, and thus, a preliminary injunction may issue regardless of whether the FTC also will prevail on its claims under the TSR.  Indeed, the deception alleged under the TSR and Section 5 of the FTC Act is identical, see Mot. at 19; only the allegations regarding advance fees are unique to the FTC's claims under the TSR.  In any event, the Court finds that the FTC is likely to prevail on the merits of its claims under the TSR, for the reasons stated below.

Defendants argue that the TSR is inapplicable because Ameritech does not provide a "debt relief service," but only "document preparation."  Opp'n at 19.  As discussed in

---

[7] Defendants' acts and practices fall within the purview of the TSR because the Companies receive inbound calls from consumers in response to direct mail solicitations. 16 C.F.R. § 310.6(6)(i).

greater depth in the Court's Order Denying Defendants' Motion to Dismiss, the FTC has shown that the Companies provide a "debt relief service," which the TSR defines broadly as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."  Order on MTD at 17 (quoting 16 C.F.R. § 310.2(o)); id. at 17-19.  "Defendants' services fall within that definition, as they purport to alter the terms of payment or other terms of consumers' debt."  Id. at 17.

Turning to the advance fee provisions, Defendants do not dispute that they request and receive advance fees.  Rather, Defendants assert that they comply with the TSR by: (1) partitioning the services provided by Ameritech and FEBC; and (2) utilizing escrow accounts for Ameritech's fees.  The TSR allows sellers and telemarketers "to place funds in an account to be used for the debt relief provider's fees" if various safeguards are employed.  Id. § 310.4(a)(5)(ii).  Among other things, the TSR requires that the consumer owns the funds; is paid any accrued interest; may withdraw from the debt relief service at any time without penalty; and, upon withdrawal, must receive all funds in the account, less any funds earned by the debt relief service under section 310.4(a)(5)(i).  Id. § 310.4(a)(5)(ii).  Sellers and telemarketers must disclose this information to consumers "truthfully, in a clear and conspicuous manner."  Id. § 310.3(a)(1)(viii)(D).

In 2015, Defendants partitioned the services provided by Ameritech and FEBC.  According to Defendants, this allows FEBC to collect fees for its financial education membership, which they claim is not a debt relief service.  As for Ameritech's fees, Defendants assert that, since 2015, they have utilized and properly disclosed their use of escrow accounts.  According to Defendants, "Ameritech requires consumers to deposit funds into an escrow account and only withdraws those funds when the consumer has been enrolled in a loan repayment program, and the individual has made the first payment under the new loan program."  Opp'n at 20.  In support of this assertion, Defendants cite only a

copy of the current Ameritech Agreement executed by consumers.  Id.; Cutter Decl. ¶ 11 & Ex. 5, Dkt. 79-55 & 79-60.  Defendants' showing is uncompelling.

As a threshold matter, the consumer agreement alone is insufficient to establish that Defendants' have properly disclosed the use of escrow accounts, let alone that they have fully complied with the TSR's advance fee provisions.  As noted above, Defendants rely on the "current" Ameritech Agreement.  Cutter Decl. ¶ 11.  Even assuming that the current version of the consumer agreement contains all requisite disclosures, prior versions did not. See Order on MTD at 21 n.8 (citing Compl., Ex. G).  Moreover, Defendants acknowledge that funds are withdrawn from consumers' escrow accounts before they have been enrolled in a federal repayment program and made their first payment thereunder.  See Ortiz, Ex. FFF at 3-4 (Ameritech collects fees "after the company completes and submits federal application documents").  This is impermissible under the TSR.[8]

Accordingly, based on the evidence presented, the Court find that the FTC is likely to prevail on its claims under the TSR.

## C. WEIGHING THE EQUITIES

The Court has concluded above that the FTC is likely to prevail on its claims under the FTC Act and TSR.  Therefore, the second step in deciding whether to grant a preliminary injunction is a balancing of the equities.  Although the court weighs both the private and public interests, the public interests "receive far greater weight."  Warner Commc'ns, 742 F.2d at 1165; accord Affordable Media, 179 F.3d at 1236.  "When the Commission demonstrates a likelihood of ultimate success, a countershowing of private

---

[8] The FTC also argues that the partitioning of Ameritech and FEBC is a "sham" intended to circumvent the TSR by "funneling many of the fees to FEBC."  Mot. at 20.  As the Court has previously noted, it is an open question whether the shuttering of AFBC in favor of separate corporate forms serves to shield Defendants from the strictures of the TSR.  Order on MTD at 14 n.4.  Other courts have rejected such tactics.  See CFPB v. Morgan Drexen, Inc., 60 F. Supp. 3d 1082, 1085-86, 1093-94 (C.D. Cal. 2014) (denying motion to dismiss claim for violation of the TSR where the defendants "disguised" advanced fees by utilizing separate contracts for "debt relief" and "bankruptcy" services and the bankruptcy services appeared to be a sham).  Because the FTC is likely to prevail on its claim for violation of the TSR's advance fee provisions based solely on Ameritech's practices, however, the Court need not delve into FEBC.

equities alone does not justify denial of a preliminary injunction." <u>Warner Commc'ns</u>, 742 F.2d at 1165. Here, a balancing of the equities militate in favor of a preliminary injunction.

As discussed above, the FTC is likely to prevail on the merits of its claims regarding Defendants' deceptive and abusive business practices. These practices result in ongoing injury to consumers. Consumers are enrolled in a financial education membership program for which they are charged monthly fees. Consumers may be unaware that these fees are for services entirely unrelated to their enrollment in an alternative repayment plan and are not used to pay down their student loans. Furthermore, after consumers are told that they are pre-qualified for an alternative repayment plan, their loans are often placed in forbearance, possibly for lengthy periods, during which interest continues to accrue. Only later do some consumers learn that they are ineligible for the promised plan. Still other consumers continue to be enrolled in repayment plans for which they are (perhaps unknowingly) ineligible due to Defendants' practice of inflating borrowers' family size. Finally, consumers enroll in "the program" under the false belief that they will achieve permanent payment reduction and loan forgiveness resulting in advertised savings of thousands of dollars. Defendants cannot guarantee such results, however, and consumers' loan balances may *increase* because of Defendants' practices.

Mitigation of this harm is in the public interest. <u>FTC v. Southwest Sunsites, Inc.</u>, 665 F.2d 711, 723 (5th Cir. 1982) (Injunctive relief is appropriate where evidence suggests "a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint.").

Defendants argue that the FTC "cannot demonstrate that, on the whole, consumers were deceived." Opp'n at 21. In support of this assertion, Defendants note that 19,048 consumers have been enrolled in an IDR program. For the reasons discussed above, however, the mere fact that consumers have been successfully enrolled in a repayment plan does not show that they have not been deceived. Defendants further argue that "consumers will indisputably be harmed if Ameritech is shutdown, particularly if the closure is abrupt." <u>Id.</u> They assert that consumers may lose months of reduced repayment benefits or

potentially their continued eligibility to participate in an alternative repayment program if paperwork is not timely and correctly completed.  The Court is unpersuaded.  Whether and to what extent Defendants' services are of actual benefit to consumers is subject to serious question.  In any event, Ameritech may continue providing services insofar as its business practices are lawful.  There is no oppressive hardship in requiring Defendants to comply with the law.  See World Wide Factors, 882 F.2d at 347.  Insofar as Defendants' business practices are unlawful, however, harm will be avoided by bringing them to an end.  In that case, measures may be employed to minimize disruption to consumers.

### D.   ADDITIONAL EVIDENCE

After briefing closed, Defendants filed an administrative motion to consider additional evidence, or, in the alternative, to hold an evidentiary hearing.  Dkt. 140.  They assert that the presentation of additional evidence is necessary because "the paper case the FTC has presented to support the Motion does not withstand scrutiny."  Id. at 1.  According to Defendants, evidence obtained through discovery shows that the "story" put forward by the FTC is "inaccurate and incomplete."  Id.  In a footnote, Defendants also assert that the FTC submitted exhibits with its Reply that included "significant new evidence."  Id. at n.1.  Defendants argue that they must be given "an opportunity to respond to new arguments raised for the first time" in the FTC's Reply.  Id.

As to the substance of the administrative motion, Defendants largely attack evidence presented by Kelly C. Ortiz ("Ms. Ortiz"), who provided a declaration in support of the FTC's motion for preliminary injunction.  Ms. Ortiz is a "Senior Federal Trade Investigator for the [FTC]" and a "custodian of documents and records that the FTC obtains during the course of [its] investigations."  Ortiz Decl. ¶¶ 1, 3.  Ms. Ortiz "participated in an investigation of [Defendants]."  Id. ¶ 3.  As part of that investigation, Ms. Ortiz collected evidence, which she describes in her declaration and attaches as exhibits thereto.  Id. ¶ 4.  For example, Ms. Ortiz catalogs hundreds of consumer complaints against Defendants that are maintained in an FTC database.  Id. ¶¶ 42-48.  Ms. Ortiz also explains that Defendants

1  produced 312,532 customer service call recordings and includes both copies and transcripts

2  of eight such calls.  Id. ¶¶ 55-71.

3  According to Defendants, the FTC "asks this Court to infer that, by [Ms. Ortiz's]

4  declaration, it may draw broad conclusions about Defendants' practices in general."  Dkt.

5  140 at 4.  Defendants assert that this inference is unsupported.  Id. at 3-4.  At her

6  deposition, Ms. Ortiz stated that the eight call recordings she reviewed were selected by the

7  FTC's counsel and that she did not know how they were selected.  Id. at 4 (citing Healy

8  Decl. ¶ 5, Dkt. 140-1).  Defendants ask why the FTC "isn't . . . talking about the other

9  312,344 calls for which they have complete recordings[.]"  Id.  They complain that the FTC

10  has not done a statistical analysis and offer a litany of other criticisms, including that Ms.

11  Ortiz made no effort to identify favorable or exculpatory evidence.  Defendants conclude

12  that "Ms. Ortiz did little to no independent investigation or analysis related to Defendants,

13  the Motion, or this litigation."  Id.[9]

14  The Court finds that Defendants' administrative motion is without basis.  Defendants

15  assert that "the FTC filed a reply brief that included over a dozen declarations and

16  approximately 1,000 pages of evidence."  Dkt. 146-1 at 2.  That may be so.  However,

17  Defendants' administrative motion does not respond to that evidence.  Nor does it identify

18  new evidence to which Defendants previously did not have access.  The only "evidence"

19  discussed in the administrative motion is Ms. Ortiz's deposition testimony, which

20  Defendants fashion to support a "hodgepodge of grievances" regarding the FTC's

21

22  [9] The FTC opposes the administrative motion.  Dkt. 142.  Among other things, the
FTC asserts in its opposition that Defendants' motive is delay and that additional discovery

23  strengthens the FTC's case.  Defendants seek leave to file a reply.  Dkt. 146.  Defendants
assert that the FTC's opposition goes "well beyond the bounds" of the administrative

24  motion and makes "numerous unfettered aspersions regarding Defendants and their
practices."  Id.  Defendants offer a "brief reply for the sole purpose of addressing certain

25  inaccuracies or misleading information in [the FTC's] opposition."  Dkt. 146-1 at 1.  The
Court finds that a response to ancillary matters raised in the FTC's opposition to

26  Defendants' administrative motion to consider additional evidence is unnecessary and
offers nothing of substance that bears on the motion for a preliminary injunction.

27  Nevertheless, in the interest of creating a complete record that allows the Court to fully
address Defendants' arguments, the Court hereby GRANTS Defendants' motion for leave

28  to file a reply in support of their administrative motion.

investigation.  Dkt. 142 at 2.  These grievances largely echo those raised in Defendants'
opposition to the motion for preliminary injunction.  Nevertheless, the Court hereby
GRANTS their motion to consider additional evidence.[10]

Turning to the substance of the administrative motion, Defendants mischaracterize
Ms. Ortiz's declaration.  Ms. Ortiz describes her efforts to collect evidence as a custodian
of documents and records.  She does not purport to have led the FTC's investigation into
Defendants.  Consequently, Defendants' assertion that Ms. Ortiz has done "little to no
independent investigation or analysis related to Defendants, the Motion, or this litigation,"
even if true, does not point to any fatal defect in the FTC's investigation.  Defendants
further posit that the FTC's evidence is not representative of their business practices.
However, the FTC has put forth a robust record that includes thousands of pages of
consumer complaints, consumer declarations, former employee declarations, consumer call
recordings, undercover call recordings, and more.  That evidence tells a consistent story—
one in which deceptive and abusive acts and practices pervade.  Moreover, Defendants
have had an opportunity to rebut the FTC's evidence and possess ample evidence regarding
their own business practices.  For example, Defendants possess the consumer call
recordings produced to the FTC.  If a statistical analysis would have been beneficial,
Defendants were free to perform and present such an analysis.  They did not.

Accordingly, although the Court grants Defendants' administrative motion to
consider additional evidence, as well as their motion for leave to file a reply in support
thereof, the evidence and arguments put forward do not alter the Court's conclusion
regarding the propriety of a preliminary injunction.

### E.   SCOPE OF INJUNCTIVE RELIEF

A district court has the authority to grant preliminary and permanent injunctive relief
pursuant to Section 13(b) of the FTC Act and Rule 65 of the Federal Rules of Civil
Procedure.  FTC v. H. N. Singer, Inc., 668 F.2d 1107, 1111 (9th Cir. 1982).  In actions

---

[10] The Court denies Defendants' alternative request for an evidentiary hearing, given
their failure to identify any specific evidence that they wish to present.

brought under Section 13(b) of the FTC Act, a court may exercise the full breadth of its equitable powers to order such ancillary relief as may be necessary to accomplish complete justice. Id. at 1111-1113 (affirming preliminary injunction that included an asset freeze as necessary to preserve funds for restitution). This includes the appointment of a receiver. World Wide Factors, 882 F.2d at 346-48 (affirming preliminary injunction that included prohibition of unlawful business practices, freezing of assets, and sua sponte appointment of receiver); see, e.g., Alliance Doc. Prep., 296 F. Supp. 3d at 1201-02, 1212 (issuing a temporary restraining order and then a preliminary injunction that included an asset freeze and appointment of a receiver).

The FTC requests the issuance of a preliminary injunction that requires Defendants to refrain from misrepresenting their services, comply with the advance fee provisions of the TSR, preserve records, and report new business activity. The FTC further requests that the Court appoint a neutral receiver to assume control of the Companies, secure their assets, and assess whether and to what extent their business can be operated lawfully. The FTC argues that "[a] neutral receiver will prevent further harm to consumers and locate and secure assets and records without disrupting legitimate business activity." Mot. at 25. Regarding the securing of assets, the FTC highlights evidence that Frere has transferred millions of dollars from the Companies to himself. Id.[11] The FTC posits that, without a receiver to secure assets, Defendants may continue to dissipate funds needed to provide consumer redress. Id. The FTC further argues that "[a] receiver would . . . help assess the extent of the fraud, trace its proceeds, prepare an accounting, and make an independent report of Defendants' activities to the Court." Id.

---

[11] Based upon a review of the Companies' bank records, the FTC notes that Frere transferred over $3.164 million from the Companies' accounts to his personal account. Ortiz Decl. ¶¶ 33-38 & Atts. Z, AA, BB; George Decl. ¶ 26 & Att. P, Dkt. 58. Bank records also show the dissipation of over $128,000 to airlines, hotels, resorts, casinos, cruise lines, and similar companies; over $202,000 to automotive and motorsports companies; and over $253,000 to companies that provide building, landscaping, and related supplies and services. George Decl. ¶¶ 15-17 & Atts. H-J. In addition, Frere directed payments of over $864,000 to members of his family and family-owned businesses. Id. ¶¶ 11-14 & Atts. D-G; Ortiz Decl., Att. J. Finally, in August 2017, Frere transferred over $2.4 million to a foreign bank account located in Andorra. Ortiz Decl. ¶¶ 35-37, Att. AA.

In the event that the Court grants the FTC's motion for a preliminary injunction, Defendants ask that the Court deny the FTC's request to appoint a receiver.[12]  Defendants again argue that consumers will be injured if Ameritech is unable to continue processing applications and recertifications for federal student loan repayment programs.  They further argue that any concern over the dissipation of assets is baseless.  Defendants attempt to explain certain of the transactions identified by the FTC, noting, for example, that company executives have twice flown to Washington D.C. to meet with FTC personnel.  Opp'n at 24.  Defendants assert that, "under the FTC's theory, the expenses for those flights should be questioned."  Id.  Defendants also take issue with the FTC "chid[ing] Mr. Frere for taking compensation and distributions, and the Companies for making distributions to investors."  Id.  Defendants argue that, "in the absence of ongoing, demonstrably deceptive practices, there is no basis for prohibiting regular compensation and distributions."  Id.

The Court is persuaded that a receiver is warranted.  First and foremost, the Court finds that a receiver is necessary to determine whether and to what extent Defendants' business practices may lawfully continue.  See Alliance Doc. Prep., 296 F. Supp. at 1212 ("[T]he public has a compelling interest in ensuring the robust enforcement of federal consumer protection laws and that interest would be harmed if Defendants were permitted to continue operations").  Defendants' misrepresentations are material and go to the core of their services.  Appointment of a receiver presents the best option to halt unlawful business practices.  If certain of Defendants' business practices may lawfully continue, appointment of a receiver also presents the best option to untangle the lawful from the unlawful, provide notice to consumers, mitigate consumer harm, and minimize any disruption in the processing of consumers' applications and recertifications.  See, e.g., id. at 1202 (charging receiver with management of the defendants' businesses and assessing whether they could be operated lawfully).

---

[12] Defendants mistakenly assert that the requested relief includes an asset freeze.  As acknowledged by the FTC, it does not.  Reply at 10.

Additionally, the Court finds that a receiver is necessary to conduct an accounting and to preserve assets.  Although Defendants contend that the dissipation of assets is not a concern, they fail to satisfactorily explain—or attempt to explain—various expenses identified by the FTC.  For example, while Defendants generally suggest that some of the expenses may be legitimate, they fail to address any of the specific charges identified, such as $19,000 in cruise line expenses or $73,000 on custom wine tanks purchased from a business owned by members of Frere's family.  Moreover, while Defendants argue that compensation and distributions to Frere and other unidentified investors are permissible absent "ongoing, demonstrably deceptive practices," the FTC has shown that Defendants engage in a pattern of deceptive conduct.  Given that fact, substantial compensation and/or distributions are of concern.  Indeed, even absent any *illegitimate* dissipation of funds, such expenditures deplete the assets that may be available for consumer redress.

Finally, the FTC requests injunctive relief against the Companies, as a common enterprise, and against Frere individually.  Defendants do not dispute the liability of the Companies or Frere.  Based on the evidence presented, the Court finds that the Companies constitute a common enterprise over which Frere has control.  See Order on MTD at 13, 14-16.  Nevertheless, the Court finds one provision of the proposed preliminary injunction to be inadequately supported.  Specifically, subsection VII.B requires that Defendants transfer or deliver to the receiver possession, custody, and control of certain property, including "[a]ll assets held by Lancel Limited Partnership, an Arizona limited partnership established by Brandon Frere, that originated from the Corporate Defendants' business practices." Dkt. 22-1 at 10.  The assertion that Lancel Limited Partnership is related to the Companies is conclusory, however, and the FTC fails to provide additional information about the entity.  Subsection VII.B is therefore omitted without prejudice to the FTC's ability to request amendment of the preliminary injunction upon a more robust showing.[13]

---

[13] Insofar as Lancel Limited Partnership falls within the purview of Subsection VII.E, nothing in this Order excuses its compliance with subsection VII or prevents the receiver from seeking to enforce compliance.

**IV.    CONCLUSION**

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.    Defendants' motion for leave to file a reply in support of their administrative motion to consider additional evidence, Dkt. 146, is GRANTED.

2.    Defendants' administrative motion to consider additional evidence, Dkt. 140, is GRANTED.

3.    The FTC's motion for a preliminary injunction, Dkt. 22, is GRANTED.  A separate preliminary injunction shall issue.

4.    This Order terminates Dockets 22, 140, and 146.

IT IS SO ORDERED.

Dated:  November 29, 2018

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge